GEORGE W. HARDY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7981.    Promulgated December 30, 1926.

*C. M. Pasquier*, *C. P. A.*, for the petitioner.
*W. F. Gibbs*, *Esq.*, for the respondent.

This proceeding involves income taxes for the calendar year 1921 in the amount of $562.21. The deficiency grows out of the disal-

lowance by the respondent of deductions from income of debts alleged by the petitioner to have been ascertained to be worthless and charged off in the taxable year. The matter arises under section 214 (a) (7) of the Revenue Act of 1921.

### FINDINGS OF FACT.

Petitioner is an individual residing in Louisiana. He is a cotton grower, and during the year 1921 he owned and operated a cotton plantation of about one thousand acres. The manager of his plantation was one Gayle. Petitioner's plantation was operated on what is known as the " share basis." His tenants were negroes who paid to their landlord a portion of the crop raised by them as rent. During the year the petitioner advanced supplies and moneys to these tenants and charged their respective accounts with the amounts so advanced. These advances were made with the agreement that such accounts would become due and payable at the time the cotton was sold. All the cotton and other crops raised on the plantation in 1921 were sold before the end of that year.

The cotton raised by the tenants was not purchased by the petitioner from them. The cotton was placed with a cotton merchant who sold it. The proceeds were received by the petitioner, who credited the respective accounts of his tenants with the share of the proceeds belonging to each.

In the year 1921, after all the crops were sold and the tenants' shares credited to their respective accounts, there were not enough of such proceeds to discharge the debts of a number of these negro tenants. The unliquidated balances so left outstanding were in the total sum of $11,194.89. The tenants were all insolvent. The petitioner knew the financial condition of all of them and that the accounts were uncollectible. On December 31, 1921, he ascertained these accounts to be worthless and charged them off his books of account as worthless. No part of the amounts so charged off in 1921 had been charged off or deducted from income by the taxpayer in any preceding year.

Some of the tenants had been with the petitioner in a prior year and a portion of the amounts charged off as worthless had been carried forward for such prior year. Others of these tenants had not worked for the petitioner in a prior year. Some of these tenants remained on the plantation of the petitioner in 1922 and were advanced by the petitioner in that year. One tenant did not so remain in 1922. No part of the amounts charged off in 1921 has since been collected by the petitioner.

To the extent that the petitioner sold goods or made advances in kind to these tenants, he credited merchandise sales and reported income thereon accordingly.

Gayle, the manager, had an open and running account with the petitioner, who also held Gayle's note for $300. The total indebtedness of Gayle, including this note, was $1,475.68 at the close of the year 1921. On December 31, 1921, petitioner charged off $300 by the following entry: "December 31, 1921. Note charged off $300." No other portion of the Gayle account was so charged off. Gayle continued thereafter to manage the plantation for the petitioner. There is no showing that Gayle was insolvent or that the $300 note was uncollectible.

The petitioner took deduction in his return on account of bad debts, in the amount of $11,619.52. The debts of the negro tenants, plus the $300 note of Gayle, total $11,494.89, which is the amount which petitioner now contends is properly deductible. The return of the petitioner showed a net loss of $997.82, which was later corrected to $649.62. The respondent disallowed the deductions above referred to and restored the amounts thereof to income. This resulted in the deficiency here in question. The amount of the deficiency determined by the respondent, of which the petitioner was duly notified, is $562.21.

OPINION.

KORNER, *Chairman:* The evidence here is illustrative of the Biblical adage that the poor we have always with us. If these tenants were not poor they would not be "cropper" tenants in the cotton belt. Generally, they are poor and almost universally they are judgment proof. On the other hand, another set of such tenants would be just as poor. If a cotton grower is to have tenants, it is from such that he must choose them. There appears to be little choice among them. If a crop is good and brings a price fair or better, they may be able to discharge to their landlord the debts incurred for advances. If their share of the crop is sufficient for that purpose, such debts are usually liquidated. The landlord generally sees' to that. But if the crop is a failure or brings a low price or worse, the landlord is out of pocket and the tenant is not much the worse off, because a year to him is just a living. Whether that living comes out of the crop he raises or out of the landlord's pocket matters little or nothing to him. If he has done the best he could under the situation, he can be fairly sure of staying on—at the landlord's risk, of course. If he has not proved reasonably efficient in the judgment of the landlord, he merely lives the next year at the expense of another landlord until another crop tells him the extent of the risk he has been to that landlord during that year. In the end it is all one to the tenant. The landlords, under this system,

are fairly philosophical, although it is said they are at times exacting in respect of financial arrangements with, and collections from, their cropper tenants. This system of farming is not without its hazards to the landlord, as the bank reports in the cotton belt in a bad year will show. One who knows something of the cropper tenant system in the cotton belt does not have to tax his credulity to believe that the landlord finds means to credit his outstanding accounts to the capacity of the tenant. He commonly sees to it that there is rendered to Caesar the due that is Caesar's. If aught is left over, and there sometimes may be, that may be rendered to whomsoever it may be rendered. But the landlord is rarely a poor collector. The Commissioner defends on the ground that the writing off of the indebtedness of these tenants constituted a gift or forgiveness of indebtedness. Our judgment tells us that this is not so. We do not incline to the opinion that eleemosynary considerations entered into the petitioner's operation of his plantation, or that it was an impulse of generosity which prompted his charging off these debts.

To one who has read the record, it is apparent that the financial picture here can not be drawn with the fine point of a Rembrandt or a Dürer, or painted with the nicety of a Botticelli. A broad brush must be used, for the picture is a broad one of the lives of the lowly.

It is clear to us that the petitioner knew the financial conditions of his tenants. No one knew better. In the light of that knowledge, he ascertained these accounts to be worthless and in the taxable year he charged them off. The statute gave him a right to do so and to take a deduction from his tax return accordingly. That he continued to employ these tenants, under the conditions shown here, can not affect the result. *Midland Coal Co.*, 1 B. T. A. 311.

As to the overseer or manager of the plantation, Gayle, we are not so convinced. Gayle had a substantial account with the petitioner, who also held Gayle's note for $300. He continued on thereafter as manager of the petitioner's plantation. The only amount petitioner charged off at the end of the taxable year was Gayle's note of $300. The open account in a substantial amount was not charged off. We are not convinced that the petitioner correctly ascertained the note to be worthless, while at the same time holding the open account to be good.

In our opinion the petitioner is entitled to his deduction for bad debts to the extent of $11,194.89.

*Judgment will be entered on 15 days' notice, under Rule 50.*